**ANDERSON & KARRENBERG**
Jared D. Scott (#15066)
50 West Broadway, Suite 600
Salt Lake City, Utah 84101-2035
Telephone: (801) 534-1700
Facsimile: (801) 364-7697
jscott@aklawfirm.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| FRANKI CHIPMAN, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>CHECK CITY PARTNERSHIP, LLC,<br><br>    Defendant. | **COMPLAINT**<br><br>Case No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiff Franki Chipman ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this action against Defendant Check City Partnership, LLC ("Defendant") and alleges, upon personal knowledge as to her own actions and her counsel's investigation, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.      Plaintiff brings this class action against Defendant for their failure to properly secure and safeguard the personally identifiable information ("PII") including but not limited to name, email-addresses, Social Security number, address, employment information, and financial

information, of Plaintiff and other similarly situated individuals ("Class Members").

2.     Upon information and belief, on May 9, 2025, a threat actor gained access to Defendant's network through a cybersecurity incident, and stole customer and employee information, including Plaintiff's and Class Members.[1]

3.     Upon information and belief, Cl0p ransomware group claimed responsibility for exfiltrating the PII of customers and employees of Defendant. Upon information and belief, Cl0p has already posted Plaintiffs and Class Members PII on the dark web.

4.     "Cl0p ransomware typically targets large companies, particularly those in the financial, healthcare, manufacturing, and media industries. It has also been known to target small and medium-sized businesses." [2]

5.     Upon information and belief, before Defendant discovered the systems interruption, the hackers had already been in Defendant's information systems and downloaded files.

6.     Given that Defendant did not realize that it had been infiltrated until the hackers announced themselves by disrupting Defendant information systems, Defendant failed to implement necessary and expected monitoring, alerting, and data loss prevention tools that would have identified the malicious activity in a timelier manner.

7.     Because of Defendant's failures, Plaintiff and the proposed Class Members have suffered a severe invasion of their privacy and must now face a substantial increase in identity theft and financial fraud for years to come.

---

[1] *See* https://www.breachsense.com/breaches/check-city-data-breach/ (last visited Jun. 10, 2025).

[2] *See* https://www.sentinelone.com/anthology/clop/ (last visited Jun. 10, 2025).

## PARTIES

8.      Plaintiff Franki Chipman is a resident and citizen of Sandy, Utah.

9.      Defendant Check City Partnership, LLC is a Nevada Limited-Liability Company formed in 2003. Defendant operates under the assumed names Check City, Check City Check Cashing and CHECKCITY.COM. Defendant has its principal place of business at 2474 N University Ave, Provo, UT, 84604, where Jorge Galvez, its registered agent, is listed. Defendant has over 70 store locations in Nevada and Utah, operates online in fourteen (14) other states, and employs more than 500 employees. *See* https://www.checkcity.com (last visited 6/11/2025).

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount of controversy exceeds the sum or value of $5,000,000 exclusive of interests and costs, there are more than 100 putative Class members, and minimal diversity exists because the Plaintiff, as well as more putative Class members, are citizens of a different state than Defendant.

11.     This Court has personal jurisdiction over Defendant because it operates registered businesses under the assumed names Check City, Check City Check Cashing and CHECKCITY.COM and its principal place of business and operations is in the State of Utah. *See* https://www.checkcity.com (last visited 6/11/2025).

12.     As a Limited-Liability Company, upon information and belief, the Defendant LLC has two members Tracy Rawle and James Marchesi.  Upon information and belief, Tracey Rawle resides permanently in Utah, with no known intent to leave the state or change his legal residence from the State of Utah. *See* https://www.checkcity.com/company/tracy-rawle#:~:text=Tracy%20Rawle%20is%20a%20family,development%20and%20IT%20services

%20company (last visited 6/11/2025). James Marchesi resides permanently in Nevada, with no known intent to leave the state or change his legal residence from the State of Nevada. As such, upon information and belief, the members of the LLC are domiciled in Utah and Nevada.

13.     In addition, this Court has personal jurisdiction over Defendant because it intentionally availed itself of this jurisdiction by providing services and transacting business in the State of Utah.

14.     Venue is proper in the Court pursuant to 28 U.S.C. § 1391 because Plaintiff is domiciled in this district, Defendant operates offices in this District, and a substantial portion of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Defendant Provides Financial Services Involving Highly Sensitive Data*

15.     Defendant is a financial services company operating in multiple U.S. states which offers payday loans, installment loans, title loans, money transfers, prepaid cards, and gold buying.[3]

16.     As part of their business, Defendant collected the PII of Plaintiff and the proposed Class Members, which it held and continues to hold unencrypted in its information systems.

17.     Defendant made promises and representations to Plaintiff and Class Members that her PII would be kept safe and confidential, and that the privacy of that information would be maintained.

18.     Defendant's Privacy Notice states in relevant part: "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal

---

[3] *See* https://www.checkcity.com/ (last visited Jun. 10, 2025).

law. These measures include computer safeguards and secured files and buildings." [4]

19.     Plaintiff's and Class Members' PII was provided to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

20.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's PII safe and confidential.

21.     Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), industry standards, and representations made to Plaintiff and Class Members, to keep her PII confidential and to protect it from unauthorized access and disclosure.

22.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

*The Data Breach*

23.     As previously stated, on May 9, 2025, an unauthorized threat actor accessed and obtained information about certain customer and employee accounts.

24.     Threat actor Cl0p claimed responsibility for the cyberattack against Defendant. Defendant has yet to acknowledge the breach.

25.     Upon information and belief, the stolen information includes name, email-addresses, Social Security numbers, addresses, employment information, and financial information.[5]

---

[4] *See* https://www.checkcity.com/company/privacy-notice (last visited Jun. 10, 2025).

[5] *See* Dark Web image, attached hereto as **Exhibit A**.

26.    "In recent years cl0p ransomware has become a major cybersecurity threat, causing significant damages for a wide range of organizations and industries across the world." Cl0p ransomware is believed to have been developed by a Russian-speaking ransomware-as-a-service cybercriminal group that is primarily motivated by financial gain. [C]l0p ransomware gang operates its product on the Ransomware-as-a-Service model. As such, the cl0p virus is available for sale on the dark web and can technically be used by any cybercriminal who is willing to pay for the ransomware."[6]

***Defendant's Data Breach Was Imminently Foreseeable***

27.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

28.    Data thieves regularly target institutions like Defendant due to the highly sensitive information in her custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

29.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[7]

30.    As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed

---

[6] *See* https://www.kaspersky.com/resource-center/definitions/cl0p-ransomware (last visited Jun. 10, 2025)

[7] *See* Identity Theft Res. Ctr., *2021 Data Breach Annual Report*, at 6 (Jan. 2022), https://notified.idtheftcenter.org/s/.

on Plaintiff and Class Members because of a breach.

31.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

32.    Defendant were, or should have been, fully aware of the unique type and the significant volume of data in its systems, amounting to potentially thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

33.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

34.    The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

*Value of Personally Identifiable Information*

35.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[8] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number,

---

[8] 17 C.F.R. § 248.201 (2013).

employer or taxpayer identification number."[9]

36.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[10]

37.    For example, PII can be sold at a price ranging from $40 to $200.[11]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[12]

38.    Based on the foregoing, the information compromised in the Data Breach is even more significant because it includes Social Security numbers and other government identification, which is significantly difficult if not impossible to change.

39.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[13]

40.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability

---

[9] *Id.*

[10] Anita George, *Your Personal Data Is for Sale on The Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[11] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[12] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark.

[13] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

***Defendant Failed to Comply with FTC Guidelines***

41.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

42.    In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand her network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

43.    The FTC further recommends that companies not maintain PII longer than is

---

[14] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

44.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet her data security obligations.

45.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

46.    Defendant was at all times fully aware of its obligation to protect the PII of consumers under the FTC Act yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

***Defendant Failed to Comply with Industry Standards***

47.    Experts studying cybersecurity routinely identify institutions that store PII like

Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

48.    Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

49.    Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

50.    Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

51.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

52.    Defendant failed to comply with these accepted standards, thereby permitting the

Data Breach to occur.

***Common Injuries & Damages***

53.     Because of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); and (d) the continued risk to her PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

***The Data Breach Increases Victims' Risk of Identity Theft***

54.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' Social Security number falling into the hands of identity thieves.

55.     The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

56.     Further, the standard operating procedure for cybercriminals is to use some data, like the Social Security numbers here, to access "fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using

12

this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.[15]

57.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

58.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

59.    Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that her PII was compromised, as in this Data Breach, the

---

[15] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and Defendant arguing that the individual failed to mitigate damages.

60.     The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

61.     By spending this time, data breach Plaintiff was not manufacturing her own harm, she was taking necessary steps at Defendant's direction and because the Data Breach included her Social Security number.

62.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on her accounts; changing passwords and re-securing her own computer networks; and checking her financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

63.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to her good name and credit record."[16]

---

[16] *See* U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

64.     Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

65.     Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

66.     The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard her PII.

***Plaintiff's Experience***

67.     Plaintiff is a current customer of Defendant and first received financial services a few years before the data breach.

68.     Plaintiff provided her Private Information to Defendant in exchange for services.

69.     As a condition of obtaining financial services, Plaintiff was required to supply Defendant with her Private Information—including name, address, Social Security number, date of birth, financial account information, and other private information.

70.     At the time of the Data Breach, Defendant retained Plaintiff's Private Information in its system.

71.     Upon information and belief, Plaintiff's Private Information was compromised in

the Data Breach and stolen by cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the Private Information.

72.    Plaintiff takes reasonable measures to protect her Private Information. She has never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

73.    Plaintiff stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

74.    As a result of the Data Breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. She monitors accounts and has sustained emotional distress. This is time that was lost and unproductive and took away from other activities and work duties.

75.    Plaintiff also suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that she entrusted to Defendant for the purpose of obtaining services from Defendant, which was compromised in and as a result of the Data Breach.

76.    Since the data breach, Plaintiff's financial account experienced one unauthorizes charge. As a result, Plaintiff had to cancel her bank account and be issued a new card.

77.    Plaintiff has experienced an increase in spam calls, texts, and emails seeking additional confidential information from her.

78.    Plaintiff suffered lost time, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

79.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information, especially

her name, Social Security number, and banking information being placed in the hands of criminals.

80.     Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Plaintiff's Private Information was compromised and disclosed as a result of the Data Breach.

81.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## CLASS ALLEGATIONS

82.     Plaintiff brings this class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

83.     The Class that Plaintiff seeks to represent is defined as follows:

> All persons whose PII was compromised during the Data Breach that occurred at Defendant in or about May 2025 (the "Class").

84.     Excluded from the Class is the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which a Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

85.     Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate should discovery reveal that the

class should include further categories of individuals.

86.     This action is brought and may be maintained as a class action because there is a well-defined community of interest among many persons who comprise a readily ascertainable class. A well-defined community of interest exists to warrant class-wide relief because Plaintiff and all members of the Class were subjected to the same wrongful practices by Defendant, entitling them to the same relief.

87.     The Class is so numerous that individual joinder of its members is impracticable.

88.     Common questions of law and fact exist as to members of the Class and predominate over any questions which affect only individual members of the Class. These common questions include, but are not limited to:

a.      Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.      Whether Defendant had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c.      Whether Defendant had a duty not to use the PII of Plaintiff and Class Members for non-business purposes;

d.      Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e.      When Defendant actually learned of the Data Breach;

f.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.      Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k.      Whether Plaintiff and Class Members are entitled to actual, damages, and/or statutory damages as a result of Defendant's wrongful conduct;

l.      Whether Plaintiff and Class Members are entitled to restitution because of Defendant's wrongful conduct; and

m.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of the Data Breach.

89.     Plaintiff is a member of the Class she seeks to represent, and her claims and injuries are typical of the claims and injuries of the other Class Members.

90.     Plaintiff will adequately and fairly protect the interests of other Class Members. Plaintiff has no interests adverse to the interests of absent Class Members. Plaintiff is represented by legal counsel with substantial experience in class action litigation. The interests of Class Members will be fairly and adequately protected by Plaintiff and her counsel.

91.     Defendant have acted or refused to act on grounds that apply generally to the Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

92.     A class action is superior to other available means for fair and efficient adjudication

of the claims of the Class and would be beneficial for the parties and the court. Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. The amounts owed to the many individual Class Members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual members of the class to seek and obtain relief. A class action will serve an important public interest by permitting such individuals to effectively pursue recovery of the sums owed to them. Further, class litigation prevents the potential for inconsistent or contradictory judgments raised by individual litigation. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I
### Negligence
#### *(On Behalf of Plaintiff and the Class)*

93.    Plaintiff and the Class re-allege and incorporate all the above allegations.

94.    Plaintiff and the Class provided and entrusted Defendant with certain PII as a condition of their employment and/or financial services based upon the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

95.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

96.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal

acts of a third party, which were eminently foreseeable given the ubiquity of data breaches.

97.     Defendant had a duty to exercise reasonable care in overseeing, safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiff and the Class in Defendant's possession was adequately secured and protected.

98.     Defendant owed a duty to Plaintiff and the Class to implement intrusion detection processes that would detect a data breach or unauthorized access to its systems in a timely manner.

99.     Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain pursuant to regulations, including that of former employees.

100.     Defendant also had a duty to employ proper procedures to detect and prevent the improper access, misuse, acquisition, and/or dissemination of the PII of Plaintiff and the Class.

101.     Defendant's duty to use reasonable security measures arose because of the special relationship that existed between both Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of their relationship with Defendant.

102.     Defendant owed a duty to disclose the material fact that Defendant's data security practices were inadequate to safeguard the PII of Plaintiff and the Class.

103.     A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly considering Defendant's inadequate security practices.

104.     Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in

collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's system.

105.    Defendant's own conduct created a foreseeable risk of harm to Plaintiff and the Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiff and the Class, including basic encryption techniques freely available to Defendant.

106.    Plaintiff and the Class had no ability to protect their PII that was in, and likely remains in, Defendant's possession.

107.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession, how it was compromised, and precisely the types of data that was compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

108.    Defendant, through their actions and/or omissions, unlawfully breached its duties to Plaintiff and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and the Class during the time the PII was within Defendant's possession or control.

109.    Defendant improperly and inadequately safeguarded the PII of each Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

110.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the Plaintiff and the Class in the face of increased risk of theft.

111.    Defendant, through their actions and/or omissions, unlawfully breached its duty to Plaintiff and the Class by failing to have appropriate procedures in place to detect unauthorized access or intrusions and prevent dissemination of their PII. Additionally, Defendant failed to disclose to Plaintiff and the Class that Defendant's security practices were inadequate to safeguard the PII of Plaintiff and the Class.

112.    Defendant breached their duty to exercise appropriate clearinghouse practices by failing to remove PII it was no longer required to retain pursuant to regulations, including PII of former patients.

113.    Defendant, through their actions and/or omissions, unlawfully breached their duty to adequately and timely disclose to Plaintiff and the Class the existence and scope of the Data Breach.

114.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

115.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by each Plaintiff and the Class. The PII of Plaintiff and the Class was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures and oversight.

116.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer injury.

117.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII which remains in Defendant's possession and is subject to further unauthorized disclosures so long as

23

Defendant fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

118.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class are entitled to and demand actual, consequential, and nominal damages.

## COUNT II
### Negligence *Per Se*
### *(On Behalf of Plaintiff and the Class)*

119.    Plaintiff and the Class re-allege and incorporate all the above allegations.

120.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

121.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

122.    Defendant violation of Section 5 of the FTC Act constitutes negligence *per se*.

123.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

124.    The harm that occurred because of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

125.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and are subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII of Plaintiff and the Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Personal Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

**COUNT III**
**Breach of Implied Contract**
*(On Behalf of Plaintiff and the Class)*

126.     Plaintiff and the Class re-allege and incorporate all the above allegations.

127.     Plaintiff and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining financial services and/or employment provided by Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services and/or employment.

128.     Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members

accepted Defendant's offers and provided their Private Information to Defendant.

129.    Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

130.    Plaintiff and Class Members entrusted their Private Information to Defendant. In so doing, Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

131.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

132.    Implicit in the agreement between Plaintiff and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

133.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

134.    On information and belief, at all relevant times, Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class

26

Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

135.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

136.    Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

137.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

138.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

139.    Nevada law provides that every contract includes good faith and fair dealing between the parties involved.

140.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

141.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that Private Information was compromised as a result of the Data Breach

142.    Defendant breached the implied covenant of good faith and fair dealing by failing

to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

143.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

144.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

145.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT IV
### Unjust Enrichment
### *(On Behalf of Plaintiff and the Class)*

146.    Plaintiff and the Class re-allege and incorporate all the above allegations.

147.    This Count is pled in the alternative to Count III, Breach of Implied Contract.

148.    Plaintiff and the Class conferred a benefit upon Defendant in providing PII to Defendant.

149.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and the Class. Defendant also benefited from the receipt of Plaintiff's and the Class's PII, as this was used to facilitate its services to Plaintiff and the Class.

150.    Defendant enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

151.    Instead of providing a reasonable level of security, or retention policies, which would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and the Class by utilizing cheaper, ineffective security measures. Plaintiff and the Class, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

152.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and the Class's PII because Defendant failed to adequately protect it.

153.    Plaintiff and the Class have no adequate remedy at law.

154.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and Data Breach.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.      For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.      For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C.      For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.      prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.     prohibiting Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII

    iii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iv.     requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and

30

Class Members;

v.        requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.       requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.      requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.     requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.       requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's system;

x.        requiring Defendant to conduct regular database scanning and securing checks;

xi.       requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the

employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face because of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period

of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, consequential, nominal, and statutory damages, as allowed by law in an amount to be determined;

E.    For an award of restitution and damages in an amount to be determined;

F.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.    For prejudgment interest on all amounts awarded; and

H.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Dated:  June 12, 2025

Respectfully submitted,

*/s/ Jared D. Scott*
Jared D. Scott
**ANDERSON & KARRENBERG**
50 West Broadway, Suite 600
Salt Lake City, Utah 84101-2035
Telephone: (801) 534-1700
jscott@aklawfirm.com

Ken Grunfeld
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd.
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
grunfeld@kolawyers.com

*Counsel for Plaintiff and the Putative Class*

# EXHIBIT A

# LOAN APPLICATION

**Please fill out this form and take it to the next available associate.**

**How did you hear about us?**
☐ TV ☐ Online ☐ Drive by ☐ Referred By ___

## Office Use Only

| New | Update | Re-Process |
|-----|--------|-----------|

## Applicant Information

| Last Name | First Name | Middle | Social Security Number | Date of Birth | Today's Date |
|-----------|-----------|--------|----------------------|--------------|-------------|
| | | G | | | |

| Physical Home Address | Apartment # | | |
|----------------------|-------------|-----|-----|
| | | | |

| | | City: Las Vegas | State: NV | Zip: 89110 |

| # of Months / Years at Address | ☐ Own ☑ Rent | Home Phone Number | Cell Phone | Email Address |
|-------------------------------|-------------|-------------------|-----------|---------------|
| 4yr | | | | |

## Cash Advance History

| Do You Have Any Other Outstanding Cash Advances? ☐ Yes ☐ No | If Yes, How Much Do You Owe? | When Is Your Loan Due? | Name of Company or Companies |
|---|---|---|---|
| | | | |

## Employer (or Other Source of Income) Information*

| Employer (or Other Source of Income) | Start Date | Position | Department | Work Phone / Extension |
|---|---|---|---|---|
| | | marketer | | |

| Employer's Address / Major Cross Street | Supervisor | Name you go by at work | Day of Week Paid |
|---|---|---|---|
| 8 | mauro | | |

| Date of Next Payday | Paid (Please Check One) | Direct Deposit | What Shifts Do Your Work? |
|---|---|---|---|
| 6/30/2023 | ☐ Weekly ☑ Bi-Weekly ☐ Monthly ☐ Bi-Monthly | ☑ Yes ☐ No | |

| Gross Monthly Income $ | Other sources of Income you wish to be considered? | Gross Monthly Income $ |
|---|---|---|
| $4,418.00 | | |

*Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying the obligation. Alimony, child support or separate maintenance received under ☐ court order ☐ written agreement, ☐ oral understanding. (Check One).

## References/Contact Persons

| Relative (Not Living With You) | Relationship | City and State | Phone |
|---|---|---|---|
| | | Las Vegas, NV | |

| Personal Reference (Not Living With You) | | City and State | |
|---|---|---|---|
| | | Las Vegas, NV | |

| Personal Reference | | City and State | |
|---|---|---|---|
| | | Las Vegas, NV | |

**Please provide 3 references if applying for a Signature Loan

Notice: Please review and sign Page 2 of 2