Jason R. Hull [11202]
Anikka T. Hoidal [16489]
**MARSHALL OLSON & HULL, PC**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Tel: 801.456.7655
jhull@mohtrail.com
ahoidal@mohtrial.com

John J. Nelson (admitted *pro hac vice*)
**MILBERG, PLLC**
280 S. Beverly Drive-Penthouse
Beverly Hills, CA 90212
T: (858) 209-6941
jnelson@milberg.com

Brittany Resch (admitted *pro hac vice*)
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: 872.263.1100
bresch@straussborrelli.com

Leanna Loginov (admitted *pro hac vice*)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave STE 705
Miami, Florida 33132
T: (305) 479-2299
lloginov@shamisgentile.com

*Counsel continues on signature page*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| *In Re CCI Financial Data Litigation* | Case No. 2:25-cv-00468 <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Hon. Jill N. Parrish <br> Magistrate Judge  Cecilia M. Romero <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Matthew Hunsaker, Elizabeth Brady, Vicelia Castro, William Sparmak, Jeremy Jenkins, Jessica Christensen, Vinicius De Oliviera, and Jacquiline Jackson ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Defendant CCI Financial, Inc. d/b/a CheckCity.com ("Defendant"), alleging as follows:

## SUMMARY OF ACTION

1.     This putative class action is about Defendant's failure to properly secure and

safeguard Plaintiffs' and Class Members' highly sensitive personally identifiable information ("PII") from a foreseeable, preventable data breach. Due to Defendant's deficient data security, in April 2025 the notorious ransomware gang known as CL0P targeted and stole Plaintiffs' and Class Members' highly sensitive PII from Defendant's systems—including full names, Social Security numbers, driver's license numbers and/or government issued ID numbers, financial information, and dates of birth—held the sensitive and confidential data for ransom, and published it on the dark web.

2.       Defendant is a financial institution that provides tax refund loans, payday loans, installment loans, personal loans, and other financial services to consumers.

3.       As part of its business and for profit, Defendant obtained, stored, processed, and used Plaintiffs' and Class Members' Private Information. Defendant benefited substantially from Plaintiffs' and Class Members' Private Information and could not perform its operations or provide the services it does without collecting and using that data.

4.       In obtaining, possessing, controlling, and benefitting from Plaintiffs' and Class Members' PII, Defendant assumed a duty to securely store and protect it.

5.       Financial services businesses that handle patients' PII (like Defendant) owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that the exposure of PII to unauthorized persons— especially hackers with nefarious intentions like the CL0P group involved here—will harm the affected individuals, including but not limited to the invasion of their private financial matters.

6.       Defendant breached these duties and betrayed Plaintiffs' and Class Members' trust by failing to properly safeguard and protect their Private Information, thus causing and allowing cybercriminals to target, access, acquire, and misuse that sensitive data through the Data Breach.

2

7.    The mechanism of the cyberattack and potential for improper disclosure of PII was or should have been a known risk to Defendant, and thus, Defendant knew failing to take reasonable steps to secure Plaintiffs' and Class Members' PII left it in a dangerous condition. Yet, Defendant failed to adequately protect Plaintiffs' and Class Members' PII, and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted PII was compromised due to Defendant's negligent acts and omissions and its utter disregard for Plaintiffs' and Class Members' privacy.

8.    Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords. Moreover, Defendant knew or should have known it would be the target of a cyber-attack such as this due to its status as a financial company that collects and maintains highly valuable PII on its systems.

9.    CL0P targeted and obtained Plaintiffs' and Class Members' PII from Defendant's systems because of the data's value in exploiting and stealing Plaintiffs' and Class Members' identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle PII with reasonable care, Plaintiffs' and Class Members' PII was accessed by cybercriminals and exposed to an untold number of unauthorized individuals. Plaintiffs' and Class Members' PII has already been misused due to the Data Breach, and the present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

10.    The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's PII due to a breach ensures that the individual will be at a substantially increased and certainly impending risk

of identity theft crimes, potentially for the rest of his or her life. Mitigating that risk, to the extent even possible, requires significant time and money on prophylactic measures.

11.    As a result of the Data Breach, Plaintiffs and Class Members, suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their PII; (g) loss of privacy; (h) emotional distress including anxiety and stress; and (i) the continued risk to their sensitive PII, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

12.    To recover for these harms, Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence/negligence *per se*, breach of implied contract, unjust enrichment, and Violation of the California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798, *et seq*., to address Defendant's inadequate safeguarding of Plaintiffs' and Class Members' PII in Defendant's care and the host of injuries that resulted from Defendant's failures.

13.    Plaintiffs and Class Members have a continuing interest in ensuring that their PII is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class are citizens of states different from Defendant.

15.    This Court has personal jurisdiction over Defendant because Defendant is a Utah

citizen with its principal place of business in Utah, and because Defendant engages in substantial and continuous activities and conduct business in Utah.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## PARTIES

17.     Plaintiff Jeremy Jenkins is an individual domiciled in Fort Worth, Texas.

18.     Plaintiff Elizabeth Brady is an individual domiciled in West Valley City, Utah.

19.     Plaintiff Vicelia Castro is an individual domiciled in Roy, Utah.

20.     Plaintiff Matthew Hunsaker is an individual domiciled in Salt Lake City, Utah.

21.     Plaintiff Jessica Christensen is an individual domiciled in Ogden, Utah.

22.     Plaintiff William Sparmak is an individual domiciled in Rosamond, California.

23.     Plaintiff Oliviera is an individual domiciled in San Mateo, California.

24.     Plaintiff Jacquiline Jackson is an individual domiciled in San Francisco, California.

25.     Defendant CCI Financial, Inc. d/b/a CheckCity.com is a corporation organized under the state laws of Utah with its principal place of business located in Provo, Utah.

## FACTUAL ALLEGATIONS

### Defendant's Business

26.     Defendant is a financial company that provides comprehensive title insurance protection and professional settlement services.

27.     Plaintiffs and Class Members are current and former customers of Defendant.

28.     In the course of their dealings, customers of Defendant, including Plaintiffs and Class Members, were required to entrust Defendant with at least the following PII: names, dates of birth, Social Security numbers, drivers' license numbers, financial information, and other sensitive information.

29.    In the course of collecting PII from Plaintiffs and Class Members, Defendant promised to provide confidentiality and adequate security for the data it collected from customers through its applicable privacy policy and through other disclosures.

30.    Indeed, Defendant warranted on its website, "We follow generally accepted industry standards to protect the personal information submitted to us, both during transmission and once we receive it. Our servers are protected by reasonable physical and electronic security measures."[1]

31.    Plaintiffs and the Class Members, as customers of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII is involved.

***The Data Breach***

32.    On or about September 10, 2025, Defendant began sending Plaintiffs and other Data Breach victims an untitled letter (the "Notice Letters"), informing as follows:

**What Happened?**

On or about April 3, 2025, we observed a network disruption event as a result of unauthorized access to our network. . . . [I]t was determined that some of our files may have been accessed and/or removed by the unauthorized individual(s) on or about March 21, 2025. We conducted a thorough review of the potentially impacted data and on August 11, 2025, we determined that the impacted files may have contained your personal information.

**What Information Was Involved?**

The information that may have been impacted contained some of your personal information, including your name, Social Security

---

[1] Check City Privacy Policy, available at https://www.checkcity.com/company/privacy-policy.

number, driver's license number and/or government issued ID number, financial information, and date of birth.[2]

33.   Since receiving Defendant's Notice Letters, Plaintiffs learned the notorious CL0P ransomware gang was behind the Data Breach. On or about May 9, 2025, CL0P posted the Data Breach on its dark web leak site with a "warning" that "[Defendant] doesn't care about its customers, it ignored their security!!" (shown in the screenshot below). The CL0P dark web post includes proof images of unencrypted, unredacted files containing Class Members' full names in combination with Social Security numbers and other PII stolen in the Data Breach, which are cropped from the below image for Class Members' privacy:

---

[2] The "Notice Letter". A sample copy is available at https://oag.ca.gov/system/files/Check_City-CCI_Financial_Sample_Notice_Letter_CA_Residents_36795586v1.pdf



34.    CL0P is the same ransomware group that perpetrated the extensive MOVEit cyberattack that many industries, including financial services in 2023, and which Defendant knew or should have known given its position as a sophisticated financial institution.

35.    CL0P is known for using a "double-extortion" tactic, in which it both encrypts and steals victim data. If the ransom is not paid, CL0P not only refuses to restore access but also publishes the exfiltrated data on its leak site. However, even when ransomware groups like CL0P receive a ransom payment, they often refuse to return or destroy the stolen PII regardless.

36.    CL0P's *modus operandi* along with the above screenshot makes clear: CL0P targeted Plaintiffs' and Class Members' PII on Defendant's systems, stole it, held it for ransom,

and published it on the dark web. In other words, Plaintiffs' and Class Members' PII is *already* being misused.

37.     Yet, in its Notice Letters Defendant failed to inform Plaintiffs and Class Members of CL0P's publication and misuse of their PII, or any other pertinent detail. Omitted from Defendant's Notice Letters were the identity of the cybercriminals who perpetrated this Data Breach, the date(s) of the Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again, or, crucially, that the notorious CL0P ransomware gang had stolen Plaintiffs' and Class Members' PII, held it for ransom, and posted it on the dark web. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their PII remains protected.

38.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

39.     Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including (a) this Data Breach was the work of cybercriminals (b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data; and (c) once inside Defendant's networks and systems, the cybercriminals targeted Plaintiffs' and Class Members' PII for download and theft.

40.     In the context of notice of data breach letters of this type, Defendant's use of the phrase "may have been accessed and/or removed" is misleading lawyer language. Companies only send notice letters because data breach notification laws require them to do so. And such letters are only sent to those persons who Defendant itself has a reasonable belief that such personal

information was accessed or acquired by an unauthorized individual or entity. Defendant cannot hide behind legalese – by sending a notice of data breach letter to Plaintiffs and Class Members, it admits that Defendant itself has a reasonable belief that Plaintiffs' and Class Members' names, dates of birth, and Social Security numbers were accessed or acquired by an unknown actor – aka cybercriminals.

41.    Indeed, the Identity Theft Research Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[3]

42.    In a 2019 study, researchers found that "97 percent of the 161 sampled notifications were difficult or fairly difficult to read based on readability metrics, and that the language used in them may have contributed to confusion about whether the recipient of the communication was at risk and should take action." The researchers went on to note that breached entities "use hedge terms that downplay risk—using phrases like 'you might be affected' and 'you are likely to be affected'" as "[f]or most companies, those notifications are only seen as a requirement for complying with data breach notification laws rather than a way to educate and protect their customers."[4]

43.    Moreover, California Civ. Code § 1798.82(a) requires the following:

---

[3] Identity Theft Resource Center, *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, ITRC (Jan. 28, 2025), available at https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/

[4] Yixin Zou, *Companies Send Confusing Alerts About Data Breaches*, FUTURITY (May 19, 2019), available at https://www.futurity.org/data-breaches-notifications-2066072/

A person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose a breach of the security of the system following discovery or notification of the breach in the security of the data to a resident of California (1) whose unencrypted personal information *was, or is reasonably believed to have been, acquired* by an unauthorized person, or, (2) whose encrypted personal information *was, or is reasonably believed to have been, acquired* by an unauthorized person and the encryption key or security credential was, or is reasonably believed to have been, acquired by an unauthorized person and the person or business that owns or licenses the encrypted information has a reasonable belief that the encryption key or security credential could render that personal information readable or usable.

44.     California Civ. Code § 1798.82(f) in turn requires that "[a]ny person or business that is required to issue a security breach notification to more than 500 California residents as a result of a single breach of the security system shall electronically submit a single sample copy of that security breach notification [] to the Attorney General." Defendant reported the Data Breach and submitted the Notice Letter to the California Secretary of State on September 10, 2025.

45.     Accordingly, while Defendant chose to say in its Notice Letter that Plaintiffs' PII *may* have been acquired, it was only obliged to report the Data Breach if it reasonably believed that the PII was actually acquired.

46.     Defendant had obligations created by the FTC Act, Gramm-Leach-Bliley Act, contract, common law, and industry standards to keep Plaintiffs' and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

47.     Defendant did not use reasonable security procedures and practices appropriate to the nature of Plaintiffs' and Class Members' sensitive information it was maintaining f, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

48.     Moreover, Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and

regularly rotating passwords.

49.    As a result of Defendant's failures, CL0P targeted, accessed, stole, and misused Plaintiffs' and Class Members' PII via the Data Breach.

50.    Plaintiffs further understand that their PII and that of Class Members was subsequently sold on the dark web following the Data Breach as two Plaintiffs' compromised PII has already been misused to commit identity theft and fraud against them.

### *Data Breaches Are Preventable*

51.    Data breaches are preventable. As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[5] Thompson added, "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[6]

52.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

53.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[7]

---

[5] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

[6] *Id.* at 28.

[7] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

54.  To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[8]

---

[8] *Id.* at 3-4.

55.     To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-Apply latest security updates
-Use threat and vulnerability management
-Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-       Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-       Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-       Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-Monitor for adversarial activities
-Hunt for brute force attempts
-Monitor for cleanup of Event Logs
-Analyze logon events;

**Harden infrastructure**

-Use Windows Defender Firewall
-Enable tamper protection
-Enable cloud-delivered protection
-       Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[9]

---

[9] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:*

56.     Given that Defendant was storing the PII of its current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

57.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the PII of more than forty thousand individuals, including that of Plaintiffs and Class Members.

***Defendant Acquires, Collects, And Stores Its Clients' Customers' PII***

58.     Defendant acquires, collects, and stores a massive amount of PII from its current and former customers.

59.     As a condition of obtaining services from Defendant's, Defendant requires that its customers and other personnel entrust it with highly sensitive personal information.

60.     By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

61.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendant absent a promise to safeguard that information.

62.     Upon information and belief, in the course of collecting PII from customers, including Plaintiffs, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

---

https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

63.     Indeed, Defendant represents on its website that: "[w]e follow generally accepted industry standards to protect the personal information submitted to us, both during transmission and once we receive it. Our servers are protected by reasonable physical and electronic security measures."[10]

64.     Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Defendant Knew, Or Should Have Known, of the Risk Because Financial Companies In Possession Of PII Are Particularly Susceptible To Cyber Attacks***

65.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting financial companies that collect and store PII, like Defendant, preceding the date of the breach.

66.     Data breaches, including those perpetrated against financial companies that store PII in their systems, have become widespread.

67.     In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[11]

68.     In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

69.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a

---

[10] https://www.checkcity.com/company/privacy-policy

[11] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/

warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[12]

70.    Additionally, as companies became more dependent on computer systems to run their business,[13] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[14]

71.    Defendant knew and understood unprotected or exposed PII in the custody of financial companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

72.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

73.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

---

[12]    https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection
[13]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[14]    https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

74.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

75.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

76.     In the Notice Letter, Defendant makes an offer of 24 months of identity monitoring services. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

77.     Defendant's offer of credit and identity monitoring establishes that Plaintiffs' and Class Members' sensitive PII was in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

78.     As a financial company in custody of the PII of its customers, Defendant knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *Value Of Personally Identifying Information*

79.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15]

---

[15] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

80.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[17]

81.    For example, PII can be sold at a price ranging from $40 to $200.[18] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

82.    Moreover, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

83.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

---

[16] *Id.*

[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[18] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[19] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

increases."[20] "Because many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[21]

84.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[22]

85.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[23] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[24]

86.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of

---

[20] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[21] *Id.*

[22] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[23] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[24] *See* https://www.investopedia.com/terms/s/ssn.asp

misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

87.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

88.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.")

89.     Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a

---

[25] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[26]

90.    Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable.  "Hackers harvest license numbers because they're a very valuable piece of information."[27]

91.    A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[28]

92.    According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

93.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[29] However, this is not the case.  As cybersecurity experts point out:

---

[26] *See* https://oag.ca.gov/idtheft/facts/your-ssn
[27] *Hackers Stole Consumers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at:* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited July 31, 2023).
[28] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited on Feb. 21, 2023)
[29] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-

"It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[30]

94.      Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[31]

95.      Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, dates of birth, and names.

96.      This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

97.      Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

98.      The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also

---

numbers-advises-consumers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited on Feb. 21, 2023).
[30] *Id.*
[31] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on Feb. 21, 2023).
[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*,    IT    World,    (Feb.    6,    2015),    *available    at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

99.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

***Defendant Fails To Comply With FTC Guidelines***

100.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

101.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

102.    The guidelines also recommend that businesses use an intrusion detection system

---

[33] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

[34] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

103.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

104.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

105.    These FTC enforcement actions include actions against financial companies, like Defendant.

106.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

107.    Defendant failed to properly implement basic data security practices.

108.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of its customers or to comply with applicable industry

---

[35] *Id.*

standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

109.    Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its customers, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### *Defendant Failed to Comply with the Gramm-Leach-Bliley Act*

110.    Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

111.    The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

112.    Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

113.    The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

114.    Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

115.    Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

116.    Upon information and belief, Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on Defendant's network systems.

117.    Defendant failed to adequately inform their customers that they were storing and/or sharing, or would store and/or share, the customers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the customer relationship ended.

118.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that

contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

119.    As alleged herein, Defendant violated the Safeguard Rule.

120.    Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of its IT partners or verify the integrity of those systems.

121.    Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class Members with a non-affiliated third party without providing Plaintiffs and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

### *Defendant Fails To Comply With Industry Standards*

122.    As noted above, experts studying cyber security routinely identify financial companies in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

123.    Several best practices have been identified that, at a minimum, should be implemented by financial companies in possession of PII, like Defendant, including but not limited

to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

124.    Other best cybersecurity practices that are standard for financial companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

125.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

126.    These foregoing frameworks are existing and applicable industry standards for financial companies, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### *Common Injuries & Damages*

127.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals,

the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

### Data Breaches Increase Victims' Risk Of Identity Theft

128.    Plaintiffs' and Class Members' unencrypted PII has already been stolen, held for ransom, and disseminated on the dark web by a notorious cybergang. Their PII will end up for further sale and publication on the dark web too, as that is the *modus operandi* of hackers.

129.    Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

130.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

131.    Plaintiffs' and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

132.    Due to the risk of one's Social Security number being exposed, state legislatures

have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[36]

133.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[37]

134.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[38] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[39]

135.    Because Social Security numbers are used to verify identities for financial accounts, criminals can match a Social Security with publicly available data like birth dates and mother's

---

[36] *See* N.C. Gen. Stat. § 132-1.10(1).

[37] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers

[38] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/

[39] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/

maiden names to fill in the gaps and gain access to accounts either by impersonating the victim over the telephone or answering security questions to gain access to online accounts.

136.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[40]

137.    With Fullz packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

138.    The development of Fullz packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[40] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn)/

139.    The existence and prevalence of Fullz packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like insurance information) of Plaintiffs and the other Class Members.

140.    Thus, even if certain information (such as insurance information) was not stolen in the data breach, criminals can still easily create a comprehensive Fullz package.

141.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss Of Time To Mitigate Risk Of Identity Theft & Fraud***

142.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

143.    Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter instructs Plaintiffs and Class Members to take the following measures to protect themselves: "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."[41]

144.    In addition, Defendant's Notice letter includes a full three pages devoted to "What You Can Do" that recommend Plaintiffs and Class Members to partake in activities such as enrolling in placing fraud alerts on their accounts, placing security freezes on their accounts, and contacting consumer reporting bureaus.[42]

145.    Defendant's extensive suggestion of steps that Plaintiffs and Class Members must

---

[41] Notice Letter.

[42] *Id.*

take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiffs and Class Members must undertake in response to the Data Breach. Plaintiffs' and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiffs and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendant's Notice Letter.

146.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

147.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[43]

148.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

149.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches

---

[43] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[44] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

### *Diminution of Value of PII*

150.    PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

151.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.

152.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.

153.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

154.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.

155.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

156.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including,

specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

157.    The fraudulent activity resulting from the Data Breach may not come to light for years.

158.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

159.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than forty thousand individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

160.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and  Necessary*

161.    Unsurprisingly given the type of targeted attack in this case, the sophisticated criminal activity, and the type of PII involved, entire batches of stolen PII have already been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

162.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.

Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

163.     Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

164.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### *Loss Of Benefit Of The Bargain*

165.     Furthermore, Defendant's poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendant for financial services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### *Plaintiff Jenkins's Experience*

166.     Plaintiff Jenkins is a current customer of Defendant To receive services, Plaintiff Jenkins was required to provide his PII to Defendant, which was then stored on Defendant's computer systems and networks.

167.     Plaintiff Jenkins received a Notice Letter from Defendant dated September 10, 2025, advising Plaintiff Jenkins that his PII was compromised in the Data Breach, including Plaintiff Jenkins's name, digital signature, financial account number, financial account routing number, and financial institution name.

168.     Plaintiff Jenkins reasonably understood and expected that Defendant would safeguard his PII and timely and adequately notify him in the event of a data breach. Plaintiff

Jenkins would not have allowed Defendant, or anyone in Defendant's position, to maintain his PII if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard his PII from unauthorized access and exfiltration.

169.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

170.    Plaintiff Jenkins greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Jenkins is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

171.    As a direct result of the Data Breach, Plaintiff Jenkins' PII has already been misused: CL0P targeted Plaintiff Jenkins' PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

172.    As a result of the Data Breach, Plaintiff Jenkins has spent significant time on the signing up for credit monitoring, monitoring his credit reports, and on other necessary mitigation efforts. This is valuable time that Plaintiff Jenkins spent that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

173.    The Data Breach has caused Plaintiff Jenkins to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing him of the fact that his PII was accessed and/or acquired by criminals as a result of the Data Breach.

174.    Plaintiff Jenkins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. After the Data Breach occurred, in an effort to mitigate the harms caused by the Data Breach, Plaintiff Jenkins enrolled in Experian credit monitoring, which costs him $27.99 monthly. In addition, Plaintiff Jenkins will continue to be at present and continued increased risk of identity theft and fraud for years to come.

175.    Plaintiff Jenkins has a continuing interest in ensuring that his PII, which upon

information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

176.     As a direct and traceable result of the Data Breach, Plaintiff Jenkins suffered actual injury and damages after his PII was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his PII being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his PII; (d) emotional distress because identity thieves now possess his PII; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his PII has likely been stolen and published on the dark web; (f) diminution in the value of his PII, a form of intangible property that Defendant obtained from Plaintiff Jenkins; and (g) other economic and non-economic harm.

### Plaintiff Brady's Experience

177.     Plaintiff is a current customer of Defendant To receive services, Plaintiff Brady was required to provide her PII to Defendant, which was then stored on Defendant's computer systems and networks.

178.     Upon information and belief, Plaintiff Brady's PII was stored on Defendant's systems at the time of the Data Breach.

179.     Upon information and belief, Plaintiff Brady is a victim of the Data Breach whose PII was accessed and/or acquired by cybercriminals in the Data Breach.

180.     Plaintiff Brady reasonably understood and expected that Defendant would safeguard her PII and timely and adequately notify her in the event of a data breach. Plaintiff Brady would not have allowed Defendant, or anyone in Defendant's position, to maintain her PII if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard her PII from unauthorized access and exfiltration.

181.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

182.    Plaintiff Brady greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Brady is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

183.    As a direct result of the Data Breach, Plaintiff Brady's PII has already been misused: CL0P targeted Plaintiff Brady's PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

184.    As a result of the Data Breach, Plaintiff Brady has spent approximately two hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, resolving suspicious activities conducted using her PII, and other necessary mitigation efforts. This is valuable time that Plaintiff Brady spent that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

185.    As a consequence of and following the Data Breach, Plaintiff Brady has suffered actual misuse of her PII. In March 2025, she experienced bank accounts opened under her name without authorization. Around the same time, a false tax return was attempted to be filed in her name.

186.    The Data Breach has caused Plaintiff Brady to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing her of the fact that her PII was accessed and/or acquired by criminals as a result of the Data Breach.

187.    Plaintiff Brady anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Brady will continue to be at present and continued increased risk of identity theft and fraud for years to come.

188.     Plaintiff Brady has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

189.     As a direct and traceable result of the Data Breach, Plaintiff Brady suffered actual injury and damages after her PII was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to her PII being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her PII; (d) emotional distress because identity thieves now possess her PII; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her PII has likely been stolen and published on the dark web; (f) diminution in the value of her PII, a form of intangible property that Defendant obtained from Plaintiff Brady; and (g) other economic and non-economic harm.

### Plaintiff Castro's Experience

190.     Plaintiff Castro is a former potential customer of Defendant To inquire about receiving services, Plaintiff Castro was required to provide her PII to Defendant, which was then stored on Defendant's computer systems and networks.

191.      Plaintiff Castro received a Notice Letter from Defendant on or around September 10, 2025, advising Plaintiff Castro that her PII was compromised in the Data Breach, including Plaintiff Castro's name, address, date of birth, Social Security Number, driver's license and/or state issued identification number, financial account number, financial account routing number and financial institution name.

192.     Plaintiff Castro reasonably understood and expected that Defendant would safeguard her PII and timely and adequately notify her in the event of a data breach. Plaintiff Castro would not have allowed Defendant, or anyone in Defendant's position, to maintain her PII if she

believed that Defendant would fail to implement reasonable and industry standard practices to safeguard her PII from unauthorized access and exfiltration.

193.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

194.    Plaintiff Castro greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Castro is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

195.    As a direct result of the Data Breach, Plaintiff Castro's PII has already been misused: CL0P targeted Plaintiff Castro's PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

196.    As a result of the Data Breach, Plaintiff Castro has spent approximately eleven hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords and disputing fraudulent charges and inquiries using her information, and other necessary mitigation efforts. This is valuable time that Plaintiff Castro spent that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

197.    As a consequence of and following the Data Breach, Plaintiff Castro has experienced multiple accounts opened under her name without authorization and fraudulent charges made to her Venmo account.

198.    The Data Breach has caused Plaintiff Castro to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing her of the fact that her PII was accessed and/or acquired by criminals as a result of the Data Breach.

199.    Plaintiff Castro anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Castro

will continue to be at present and continued increased risk of identity theft and fraud for years to come.

200.    Plaintiff Castro has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

201.    As a direct and traceable result of the Data Breach, Plaintiff Castro suffered actual injury and damages after her PII was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to her PII being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her PII; (d) emotional distress because identity thieves now possess her PII; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her PII has likely been stolen and published on the dark web; (f) diminution in the value of his/her PII, a form of intangible property that Defendant obtained from Plaintiff Castro; and (g) other economic and non-economic harm.

### *Plaintiff Hunsaker's Experience*

202.    Plaintiff Hunsaker is a former customer of Defendant To receive services, Plaintiff Hunsaker was required to provide his PII to Defendant, which was then stored on Defendant's computer systems and networks.

203.    Plaintiff Hunsaker received a Notice Letter from Defendant dated September 10, 2025, advising Plaintiff Hunsaker that his PII was compromised in the Data Breach, including Plaintiff Hunsaker's name, date of birth, Social Security number, driver's license and/or state issued identification number, financial account number, financial account routing number, and financial institution name.

204.    Plaintiff Hunsaker reasonably understood and expected that Defendant would

safeguard his PII and timely and adequately notify him in the event of a data breach. Plaintiff Hunsaker would not have allowed Defendant, or anyone in Defendant's position, to maintain his PII if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard his PII from unauthorized access and exfiltration.

205.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

206.    Plaintiff Hunsaker greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Hunsaker is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

207.    As a direct result of the Data Breach, Plaintiff Hunsaker's PII has already been misused: CL0P targeted Plaintiff Hunsaker's PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

208.    As a result of the Data Breach, Plaintiff Hunsaker has spent approximately 12 hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, and other necessary mitigation efforts. This is valuable time that Plaintiff Hunsaker spent that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

209.    The Data Breach has caused Plaintiff Hunsaker to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing him of the fact that his PII was accessed and/or acquired by criminals as a result of the Data Breach.

210.    Plaintiff Hunsaker anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Hunsaker will continue to be at present and continued increased risk of identity theft and fraud for years to come.

211.    Plaintiff Hunsaker has a continuing interest in ensuring that his PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

212.    As a direct and traceable result of the Data Breach, Plaintiff Hunsaker suffered actual injury and damages after his PII was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his PII being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his PII; (d) emotional distress because identity thieves now possess his PII; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his PII has likely been stolen and published on the dark web; (f) diminution in the value of his/her PII, a form of intangible property that Defendant  obtained from Plaintiff Hunsaker; and (g) other economic and non-economic harm.

***Plaintiff Christensen's Experience***

213.    Plaintiff Christensen is a former customer of Defendant To receive services, Plaintiff Christensen was required to provide her PII to Defendant, which was then stored on Defendant's computer systems and networks.

214.     Plaintiff Christensen received a Notice Letter from Defendant dated September 10, 2025, advising Plaintiff Christensen that her PII was compromised in the Data Breach, including Plaintiff Christensen's name, date of birth, Social Security number, driver's license and/or state issued identification number, financial account number, financial account routing number, and financial institution name.

215.    Plaintiff Christensen reasonably understood and expected that Defendant would safeguard her PII and timely and adequately notify her in the event of a data breach. Plaintiff Christensen would not have allowed Defendant, or anyone in Defendant's position, to maintain

her PII if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard her PII from unauthorized access and exfiltration.

216.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

217.    Plaintiff Christensen greatly values her privacy and PII and takes reasonable steps to maintain the confidentiality of her PII. Plaintiff Christensen is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

218.    To the best of Plaintiff Christensen's knowledge, her PII has not been compromised in a prior data breach.

219.    As a direct result of the Data Breach, Plaintiff Christensen's PII has already been misused: CL0P targeted Plaintiff Christensen's PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

220.    As a result of the Data Breach, Plaintiff Christensen has spent approximately three to four hours on the phone with her bank and on other necessary mitigation efforts. This is valuable time that Plaintiff Christensen spent that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

221.    As a consequence of and following the Data Breach, Plaintiff Christensen has experienced fraudulent charges on her bank account.

222.    The Data Breach has caused Plaintiff Christensen to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing her of the fact that her PII was accessed and/or acquired by criminals as a result of the Data Breach.

223.    Plaintiff Christensen anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff

Christensen will continue to be at present and continued increased risk of identity theft and fraud for years to come.

224.    Plaintiff Christensen has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

225.    As a direct and traceable result of the Data Breach, Plaintiff Christensen  suffered actual injury and damages after her PII was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to her PII being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her PII; (d) emotional distress because identity thieves now possess her PII; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her PII has likely been stolen and published on the dark web; (f) diminution in the value of her PII, a form of intangible property that Defendant obtained from Plaintiff Christensen; and (g) other economic and non-economic harm.

### *Plaintiff Sparmak's Experience*

226.    Plaintiff Sparmak is a current customer of Defendant To receive services, Plaintiff Sparmak was required to provide his PII to Defendant, which was then stored on Defendant's computer systems and networks.

227.    Plaintiff Sparmak received a Notice Letter from CCI dated September 10, 2025, advising Plaintiff Sparmak that his PII was compromised in the Data Breach, including Plaintiff Sparmak's name, digital signature, financial account number, financial account routing number, and financial institution name.

228.    Plaintiff Sparmak reasonably understood and expected that Defendant would safeguard his PII and timely and adequately notify him in the event of a data breach. Plaintiff

47

Sparmak would not have allowed Defendant, or anyone in Defendant's position, to maintain his PII if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard his PII from unauthorized access and exfiltration.

229.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

230.    Plaintiff Sparmak greatly values his privacy and PII and takes reasonable steps to maintain the confidentiality of his PII. Plaintiff Sparmak is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

231.    To the best of Plaintiff Sparmak's knowledge, his PII has not been compromised in a prior data breach.

232.    As a direct result of the Data Breach, Plaintiff Sparmak's PII has already been misused: CL0P targeted Plaintiff Sparmak's PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

233.    The Data Breach has caused Plaintiff Sparmak to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing him of the fact that his PII was accessed and/or acquired by criminals as a result of the Data Breach.

234.    Plaintiff Sparmak anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Sparmak will continue to be at present and continued increased risk of identity theft and fraud for years to come.

235.    Plaintiff Sparmak has a continuing interest in ensuring that his PII, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

236.    As a direct and traceable result of the Data Breach, Plaintiff Sparmak suffered

actual injury and damages after his PII was compromised in the Data Breach, including, but not limited to: (a) loss of privacy due to his PII being accessed and stolen by cybercriminals; (b) loss of the benefit of the bargain because Defendant did not adequately protect his PII; (c) emotional distress because identity thieves now possess his PII; (d) imminent and impending injury arising from the increased risk of fraud and identity theft now that his PII has likely been stolen and published on the dark web; (e) diminution in the value of his PII, a form of intangible property that Defendant obtained from Plaintiff Sparmak; and (g) other economic and non-economic harm.

### *Plaintiff Oliviera's Experience*

237.    Plaintiff  Oliviera  is  a  former customer of Defendant To  receive services, Plaintiff Oliviera was required to provide his Private Information to Defendant, which was then stored on Defendant's computer systems and networks.

238.    Plaintiff Oliviera received a Notice Letter from Defendant dated September 10, 2025, advising  Plaintiff Oliviera that his Private  Information was  compromised in  the  Data Breach, including Plaintiff Oliviera's name, date of birth, Social Security number, driver's license and/or state issued identification number, financial account number, financial account routing number, and financial institution name.

239.    Plaintiff Oliviera reasonably  understood  and  expected  that Defendant  would safeguard his Private  Information and  timely  and adequately notify him in  the  event of  a  data breach. Plaintiff Oliviera would not have allowed Defendant, or anyone in Defendant's position, to   maintain his Private   Information if he believed   that Defendant would   fail   to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration.

240.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

241.    Plaintiff Oliviera greatly   values his privacy   and Private   Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Oliviera is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

242.    To the best of Plaintiff Oliviera's knowledge, his Private Information has not been compromised in a prior data breach.

243.    As a direct result of the Data Breach, Plaintiff Oliviera's PII has already been misused: CL0P targeted Plaintiff Oliviera's PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

244.    As a result of the Data Breach, Plaintiff Oliviera has spent more than ten hours researching the breach, changing his passwords, managing spam received, and on other necessary mitigation efforts. This is valuable time that Plaintiff Oliviera spent that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

245.    As a consequence of and following the Data Breach, Plaintiff Oliviera has experienced a significant uptick of threatening spam messages, calls, and emails using his Private Information in attempts to extract payment or more information from him. Specifically, on August 13, 2025, Plaintiff Oliviera received a threatening email from an unknown sender aggressively asserting that they will file legal action against him if he does not pay them a certain sum of money. In the email, the suspected criminals cited his Private Information extensively, including his exact debt amount, name, and address, causing Plaintiff Oliviera substantial anxiety and stress. Additionally, after the Data Breach occurred, Plaintiff Oliviera accessed Cloaked's identity monitoring portal to check if his Private Information was exposed and saw that his Private Information, including his address, Social Security number, date of birth, and phone number had been compromised.

246.    The Data Breach has caused Plaintiff Oliviera to suffer fear, anxiety, and stress,

which has been compounded by Defendant's delay in noticing him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

247.    Plaintiff Oliviera anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. After the Data Breach occurred, Plaintiff Oliviera enrolled in Cloaked's identity monitoring protection program, costing $10 a month, to mitigate the harms caused by the Data Breach. In addition, Plaintiff Oliviera will continue to be at present and continued increased risk of identity theft and fraud for years to come.

248.    Plaintiff Oliviera has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

249.    As a direct and traceable result of the Data Breach, Plaintiff Oliviera suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that hisPrivate Information has likely been stolen and published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Oliviera; and (g) other economic and non-economic harm.

### Plaintiff Jackson's Experience

250.    Plaintiff Jackson is a former customer of Defendant To receive services, Plaintiff Jackson was required to provide her Private Information to Defendant, which was then

51

stored on Defendant's computer systems and networks.

251.    Plaintiff Jackson received a Notice Letter from Defendant dated September 10, 2025, advising Plaintiff Oliviera that his Private Information was compromised in the Data Breach, including Plaintiff Oliviera's name, date of birth, Social Security number, driver's license and/or state issued identification number, financial account number, financial account routing number, and financial institution name.

252.    Plaintiff Jackson reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Jackson would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration.

253.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, Defendant offered Data Breach victims a temporary subscription to a credit monitoring service.

254.    Plaintiff Jackon greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Jackson is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

255.    To the best of Plaintiff Jackson's knowledge, her Private Information has not been compromised in a prior data breach.

256.    As a direct result of the Data Breach, Plaintiff Jackson's PII has already been misused: CL0P targeted Plaintiff Jackson's PII on Defendant's systems, stole it, held it for ransom, and posted at least some of the stolen PII on its dark web leak site.

257.    As a result of the Data Breach, Plaintiff Jackson has spent more than ten hours

researching the breach, changing her passwords, managing spam received, and on other necessary mitigation efforts. This is valuable time that Plaintiff Jackson spent that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

258.    As a consequence of and following the Data Breach, Plaintiff Jackson has experienced a significant uptick of threatening spam messages, calls, and emails using her Private Information in attempts to extract payment or more information from her. Specifically, in 2025, Plaintiff Jackson received a threatening email from an unknown sender aggressively asserting that they will file legal action against him if she did not pay them a certain sum of money. In the email, the suspected criminals cited his Private Information extensively, including her exact debt amount, name, and address, causing Plaintiff Jackson substantial anxiety and stress.. Plaintiff Jackson reported the incident to the San Francisco Police Department.

259.    The Data Breach has caused Plaintiff Jackso to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

260.    Plaintiff Jackson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. After the Data Breach occurred, In addition, Plaintiff Jackson will continue to be at present and continued increased risk of identity theft and fraud for years to come.

261.    Plaintiff Jackson has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

262.    As a direct and traceable result of the Data Breach, Plaintiff Jackson suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due

to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess her Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Jackson; and (g) other economic and non-economic harm.

## CLASS ALLEGATIONS

263.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

264.    The Classes Plaintiffs seek to represent are defined as follows:

**Nationwide Class**
All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the data breach, including all those who received notice (the "Class").

**California Subclass**
All individuals residing in the State of California whose PII was accessed and/or acquired by an unauthorized party as a result of the data breach, including all those who received notice (the "California Subclass").

265.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

266.    Plaintiffs reserve the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be

narrowed, expanded, or otherwise modified.

267.    <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. On information and belief tens of thousands of Class Members were impacted in the Data Breach The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

268.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

    a.    Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

    b.    Whether Defendant had respective duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

    c.    Whether Defendant had respective duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

    d.    Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

    e.    Whether and when Defendant actually learned of the Data Breach;

    f.    Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

    g.    Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

269.  <u>Typicality:</u> Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

270.  <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

271.  <u>Adequacy:</u> Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiffs has retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

272.    <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

273.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

274.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

275.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

276.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

277.    Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

278.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

   a.    Whether Defendant failed to timely notify the Plaintiffs and the class of the Data Breach;

   b.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

   c.    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

   d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

   e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and the Class)

279.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 278 above, as if fully set forth herein.

280.    Defendant requires its clients, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing its services.

281.    Defendant gathered and stored the PII of Plaintiffs and Class Members as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

282.    Plaintiffs and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

283.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

284.    By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

285.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

286.    Defendant's duty to use reasonable security measures also arose under the GLBA,

under which they were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

287.    Defendant's duty to use reasonable security measures also arose under the Utah Consumer Privacy Act (UCPA, 13-61-101 et seq.), under which it

288.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII.

289.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of being customers of Defendant.

290.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

291.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

292.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

293.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

294.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity

theft and the fraudulent use of their PII by third parties.

295.    Defendant breached its duties, pursuant to the FTC Act, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

     a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

     b.    Failing to adequately monitor the security of their networks and systems;

     c.    Allowing unauthorized access to Class Members' PII;

     d.    Failing to detect in a timely manner that Class Members' PII had been compromised;

     e.    Failing to remove former customers' PII it was no longer required to retain pursuant to regulations, and

     f.    Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

296.    Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

297.    Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against.

298.    Defendant's violation of Section 5 of the FTC Act and GLBA constitutes negligence.

299.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

300.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

301.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry.

302.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

303.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems or transmitted through third party systems.

304.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

305.    Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

306.    Defendant was in an exclusive position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

307.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

308.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

309.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

310.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

311.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized

disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

312. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

313. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

314. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

315. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 278 above, as if fully set forth herein.

316. Plaintiffs and the Class Members provided and entrusted their PII to Defendant and provided Defendant with payments, directly or indirectly, for financial services. In exchange, Plaintiffs and Class Members should have had their PII protected with adequate data security. Plaintiffs and the Class Members provided their PII and made payments to Defendant as part of Defendant's regular business practices.

317. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data

had been breached and compromised or stolen, in return for the business services provided by Defendant. Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiffs and Class Members in its possession was secure.

318.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations that were consistent with industry standards.

319.    Pursuant to these implied contracts, Plaintiffs and Class Members provided Defendant with their confidential PII. In exchange, Defendant agreed to, among other things, and Plaintiffs and the Class understood that Defendant would: (1) provide services to Plaintiffs and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII; and (3) protect Plaintiffs' and Class Members' PII in compliance with federal and state laws and regulations and industry standards.

320.    Implied in these exchanges was a promise by Defendant to ensure the PII of Plaintiffs and Class Members in its possession was only used to provide the agreed-upon reasons, and that Defendant would take adequate measures to protect the confidentiality of Plaintiffs and Class Members' PII.

321.    A material term of this contract is a covenant by Defendant that it would take reasonable efforts to safeguard that information. Defendant breached this covenant by allowing Plaintiffs and Class Members' PII to be accessed in the Data Breach.

322.    Indeed, implicit in the agreement between Defendant and Plaintiffs and Class Members was the obligation that both parties would maintain information confidentially and securely. No reasonable consumer would provide sensitive personal and financial information as part of a commercial transaction absent an implicit understanding that it would be reasonably protected.

323.    These exchanges constituted an agreement and meeting of the minds between the parties.

324.    Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PII. The safeguarding of the PII of Plaintiffs and Class Members was critical to realize the intent of the parties.

325.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

326.    Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs and Class Members' PII.

327.    Defendant's failure to implement adequate measures to protect the PII of Plaintiffs and Class Members violated the purpose of the agreement between the parties.

328.    Defendant breached its implied contracts with Plaintiffs and Class Members to protect their PII when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) failed to comply with industry standards; (3) failed to comply with the legal obligations necessarily incorporated into these agreements; and (4) failed to notify Plaintiffs and Class Members of the specific data breached in a reasonably timely manner.

329.    As a direct and proximate result of Defendant's breach of implied contract, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and

unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

330.    As a direct and proximate result of the breach/unauthorized disclosure, Plaintiffs and Class Members are entitled to relief as set forth herein.

331.    Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

332.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 278 above, as if fully set forth herein.

333.    Plaintiffs bring this Count in the alternative to the breach of contract count above.

334.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with payments, directly or indirectly, for financial services. In exchange, Plaintiffs and Class Members should have had their PII protected with adequate data security.

335.    Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting the payments and retaining the PII entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

336.    Defendant failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value of their payments and that their PII provided.

337.    Defendant acquired the PII through inequitable means as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

338.    If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendant or obtained services from Defendant.

339.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

340.    Plaintiffs and Class Members have no adequate remedy at law.

341.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

342.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

343.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

<u>**COUNT IV**</u>
**Violation of the California Consumer Privacy Act of 2018 ("CCPA")**
**Cal. Civ. Code § 1798, *et seq.***
**(On Behalf of Plaintiffs Sparmak and Oliviera and the California Subclass)**

344.    Plaintiffs Sparmak Jackson, and Oliviera (the "Plaintiffs" for the purposes of this count) re-allege and incorporate by reference paragraphs 1 through 278 above, as if fully set forth herein, and bring this claim on behalf of themselves and the California Subclass (the "Class" for the purposes of this count).

345.    The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA.  Section 1798.150(a) specifically provides as follows:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:
>
> (A)  To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.
>
> (B)  Injunctive or declaratory relief.
>
> (C)  Any other relief the court deems proper.

346.    Defendant is a "business" under § 1798.140(b) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

347.    Plaintiffs and Class members are covered "consumers" under § 1798.140(g) in that they are natural persons who are California residents.

348.    The personal information of Plaintiffs and the Class members at issue in this lawsuit constitutes "personal information" under § 1798.150(a) and 1798.81.5, in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

349.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Class members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiffs and the Class members. Specifically, Defendant subjected Plaintiffs' and the Class members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

350.    As a direct and proximate result of Defendant's violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class members' personal information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

351.    As a direct and proximate result of Defendant's acts, Plaintiffs and the Class members were injured and lost money or property, including but not limited to the loss of Plaintiffs' and Class members' legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

352.    Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

353.    On September 16, 2025 (Plaintiff Olivera), November 11, 2025 (Plaintiff Jackson), and February 9, 2026 (Plaintiff Sparmak), Plaintiffs' counsel sent a CCPA notice letter to Defendant's registered service agents via certified mail. As Defendant has not cured the effects of the Data Breach, which would require retrieving the PII and securing the PII from continuing and future use, within 30 days of delivery of such CCPA notice letter, Plaintiffs Sparmak and Jackson seek actual damages and statutory damages of no less than $100 and up to $750 per customer record subject to the Data Breach on behalf of the California Subclass as authorized by the CCPA. Plaintiff Olivera seeks injunctive relief and actual damages and will amend this complaint upon the expiration of thirty days from the date her CCPA notice letter was sent in the event Defendant fails to adequately respond to the notice.

354.    Accordingly, Plaintiffs and the Class members by way of this complaint seek damages and all other relief available under the CCPA as a result of Defendant's violations described herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiffs and his Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.    requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

    v.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

    vi.   prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

    vii.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    viii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

    ix.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

    x.   requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

    xi.   requiring Defendant to conduct regular database scanning and securing checks;

    xii.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xiii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.      For an award of damages, including actual, nominal, statutory, consequential, and

punite damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.


**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: February 9, 2026                                    Respectfully Submitted,

                                                                By: */s/ John J. Nelson*
                                                                John J. Nelson (SBN 317598)*
                                                                **MILBERG, PLLC**
                                                                280 S. Beverly Drive - Penthouse
                                                                Beverly Hills, CA 90212
                                                                Telephone: (858) 209-6941
                                                                Email: jnelson@milberg.com

                                                                Jason R. Hull [11202]
                                                                Anikka T. Hoidal [16489]
                                                                **MARSHALL OLSON & HULL, PC**
                                                                Newhouse Building
                                                                Ten Exchange Place, Suite 350
                                                                Salt Lake City, Utah 84111
                                                                Tel: 801.456.7655
                                                                jhull@mohtrail.com
                                                                ahoidal@mohtrial.com

                                                                Brittany Resch*
                                                                **STRAUSS BORRELLI PLLC**
                                                                One Magnificent Mile
                                                                980 N Michigan Avenue, Suite 1610
                                                                Chicago, Illinois 60611
                                                                T: 872.263.1100
                                                                bresch@straussborrelli.com

Leanna Loginov*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave STE 705
Miami, Florida 33132
T: (305) 479-2299
lloginov@shamisgentile.com

Kenneth J. Grunfeld*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100
grunfeld@kolawyers.com

Grayson Wells*
(TN # 039658, MO # 73068)
**Stranch, Jennings & Garvey, PLLC**
The Freedom Center
223 Rosa L. Parks Ave, Suite 200
Nashville, TN 37211
Tel: (615) 254-8801
gwells@stranchlaw.com

*admitted *pro hac vice*

*Interim Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of February, 2026, I electronically filed the foregoing

CONSOLIDATED COMPLAINT with the Clerk of the Court using the CM/ECF filing system

which sent notification to all counsel of record.

*/s/ John J. Nelson*